# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Cr. No. 2:21-CR-20187-MSN |
| | ) |
| JASON TURNER, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

COMES NOW, the United States, by and through Joseph C. Murphy, United States Attorney and Nathan A. Vrazel, Special Assistant United States Attorney for the Western District of Tennessee, and for good cause, respectfully requests that the Court deny the Defendant's Motion to Suppress. In support thereof, the United States submits the following:

## FACTUAL BACKGROUND

On February 24, 2020, at approximately 4:25 P.M., Memphis Police Department Detectives Brain Scott and Dedrick Burnett observed Jason Turner, the defendant, and Katelyn Privett, the defendant's girlfriend, walking from a Taco Bell restaurant towards the Regal Inn located at 4063 South 3rd Street, Memphis, Tennessee 38109. Police had been surveilling the defendant and Privett at the Regal Inn for the past several weeks because a reliable confidential informant ("CI") had told Detective Johnathon Bond that a man named Jason Turner was selling cocaine out of his motel room. He further informed police the defendant was armed with a pistol ninety percent of the time and would likely have his girlfriend with him. The CI was even able to describe the car utilized by

the defendant: a maroon or burgundy Chevrolet Impala. Rather than immediately initiating surveillance of the defendant, Detective Bond first researched his criminal history and discovered multiple felony convictions for possession of cocaine. Police were also aware that this motel was in a high drug trafficking area. Specifically, the Regal Inn was known to police to be a place where drugs had been sold in the past.

During their surveillance, police saw a vehicle that matched the given description parked in front of the defendant's motel room. Detectives also observed the defendant exiting this car. Katelyn Privett, who matched the CI's description of the girlfriend was also seen staying at the motel with Turner. The defendant and Privett initially occupied room 121 but switched to room 119 during the final days they were being surveilled. Police saw different people come and go every ten to fifteen minutes from each the two rooms while the defendant occupied them. Bond also observed what he believed to be hand to hand transactions at the rooms with some of the visitors. In the aggregate, the CI's accurate descriptions, the defendant's criminal drug history, the frequent visitors to a room at a motel where drugs were known to have been trafficked in the past, and the apparent hand to hand transactions led detectives to conclude the allegations of drug trafficking were credible.

On February 24, 2020, police again observed substantive foot traffic at the defendant's motel room consistent with narcotics transactions. Hence, once the defendant and Privett began walking back to the motel from the Taco Bell that day, Detectives Scott and Burnett approached them in a marked squad car to initiate a stop and ask the defendant about the allegations. Scott and Burnett both wore police vests that identified them as law enforcement. Once within earshot, Scott called to the defendant saying, "Come over here." The defendant complied and walked toward the police. Detective Scott then explained they wanted to ask him about a drug dealing complaint they

had received. Upon hearing that the police were investigating him in connection with narcotics, the defendant immediately put his right hand in his right jacket pocket. Suspecting he might be reaching for a weapon, Scott grabbed the defendant's right hand through the outer layer of his jacket. In doing so, Scott felt the outline of a handgun in the defendant's pocket. The detectives then secured the gun and detained the defendant and Privett in the back of the squad car.

Once secured, detectives asked the defendant if they could search room 119, and he verbally consented. Police then entered the motel room with a key provided by the defendant. Once inside, detectives found two digital scales on a bed. One of the scales had a white powdery residue consistent with cocaine on it. The defendant was taken to the police station where he was mirandized and signed a typed confession admitting to possessing the firearm. He was eventually brought to the Shelby County Jail, booked, and charged with being a convicted felon in possession of a handgun and possession of drug paraphernalia.

## ARGUMENT

The Fourth Amendment protects citizens from unreasonable and warrantless searches and seizures by the government. U.S. Const. amend. IV. A person "is entitled to be free from unreasonable governmental intrusion" wherever he or she has a "reasonable 'expectation of privacy.'" *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)). The remedy for defendants who have had their Fourth Amendment Rights violated is to exclude all evidence obtained in as a result of that violation. *See Terry*, 392 U.S. at 12-13. The Supreme Court has gone on to explain that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 16.

Police may only perform a brief investigatory stop if they have a "reasonable, articulable

suspicion that the person has been, is or is about to be engaged in criminal activity." *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)). Reasonable suspicion is more than a "hunch," *Terry*, 392 U.S. at 27, but "'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Probable cause exists when "'facts and circumstances within their (the officers') knowledge and of which they had reasonable trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). Reasonable suspicion exists when under "the 'totality of the circumstances' . . . the detaining officer has a 'particularized and objective basis" for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citation omitted).

Determining whether an investigative stop is constitutional involves a two-part analysis. *United States v. Perez*, 440 F.3d 363, 369–70 (6th Cir. 2006) (citing *Terry*, 392 U.S. at 20). First, the police must have been justified in initiating the stop. *Perez*, 440 F.3d at 369. Second, the stop must have been "reasonably related in scope to the circumstances which justified interference in the first place." *Id.* (quoting *Terry*, 392 U.S. at 20).

**A) The Stop Of The Defendant Was Constitutional Because Police Had Reasonable Suspicion That He Was Engaged In Criminal Activity.**

Given the totality of the circumstances, the police clearly had reasonable suspicion to initiate a brief investigatory stop of the defendant. In analyzing the constitutionality of a stop, "due weight" must be given "to the officers' factual inferences, as their specialized training and

experiences allow them to draw 'inferences from and deductions about the cumulative information available to [them] that might well elude an untrained person.'" *United States v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008) (quoting *United States v. Marxen*, 410 F.3d 326, 331–32 (6th Cir.2005)). While an innocent explanation may exist for the actions that that gave police reasonable suspicion, a court is not required to adopt the innocuous reasons. *United States v. Johnson*, 428 F. App'x 616, 620 (6th Cir. 2011) (unpublished table decision).

In *Johnson*, a CI told police that drugs were being trafficked and prostitution was occurring within a specific apartment unit at a Nashville housing project. *Id.* at 617. Shortly after Police Officer Darrell Morton and Detective David Layne went to the address, they saw an unidentified male, Anthony Johnson, walking toward the unit of interest. *Id.* Morton called out to Johnson stating "Hey, police, I want to talk with you." *Id.* Upon hearing this, Johnson began to knock on the apartment door and demand that he be let in. *Id.* at 617–18. Despite Morton hurrying his pace, Johnson was able to enter the building before police reached him. *Id.* at 618. However, Johnson then exited the residence within five seconds of entering it. *Id.*

Once outside again, the police began to question Johnson about where he lived and asked him for identification. *Id.* As Johnson was "fumbl[ing] through his pockets appearing to look for ID" police asked if he had anything illegal on his person. *Id.* Johnson replied he did not. *Id.* Officer Morton then patted down Johnson's left side and "detected a bulge, which turned out to be keys."[1] *Id.* As Morton continued the frisk, Johnson repeatedly turned his body to prevent police from checking the right side of his person. *Id.* Police then noticed the "defendant's jacket was severely

---

[1] Officer Morton testified that Johnson stated "You can check me" prior to frisking him. *Johnson*, 428 F. App'x at 618. However, Johnson also testified at the suppression hearing and denied ever giving the police permission to search him. *Id.* Regardless, whether Johnson gave permission was moot because the Sixth Circuit did not consider it in the analysis for the constitutionality of the search. *See id.* at 620–21 (analyzing the totality of the circumstances factors and noticeably omitting any discussion of the defendant's alleged verbal consent).

sagging from the outer pocket on the right side of the jacket." *Id.* The presence of a handgun became "immediately apparent" to Morton "just from the feel of the object inside the jacket pocket." *Id.* Once Morton discovered this, police ordered Johnson onto his back and retrieved the pistol from the jacket. *Id.*

Johnson was subsequently charged with being a felon in possession of a handgun under 18 U.S.C. § 922(g). *Johnson*, 428 F. App'x at 617. After Johnson's motion to suppress the firearm was denied by the United States District Court, he entered a plea of guilty while reserving his right to appeal. *Id.* On appeal to the Sixth Circuit, Johnson argued that his motion to suppress was improperly denied. *Id.* However, the Sixth Circuit disagreed and held that the police had "reasonable suspicion to conduct a *Terry* stop followed by a search of the defendant's person. *Id.* (citing *Terry*, 392 U.S. at 88).

In reaching its conclusion, the Sixth Circuit noted "that reasonable suspicion does not materialize merely because a person looked suspicious and was in a 'high drug problem area.'" *Johnson*, 428 F. App'x at 620 (quoting *Brown v. Texas*, 443 U.S. 47, 49 (1979)). To further emphasize this limitation on what amounts to reasonable suspicion, the Sixth Circuit cited to a myriad of past rulings issued by the United States Supreme Court and itself. *See Johnson*, 428 F. App'x at 620 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Johnson*, 620 F.3d at 692; *United States v. Keith*, 559 F.3d 499, 506 (6th Cir.2009); *United States v. See*, 574 F.3d 309, 313–14 (6th Cir.2009); *United States v. Patterson*, 340 F.3d 368, 369–70 (6th Cir.2003); *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir.2006)). Nonetheless, the court distinguished *Johnson* from the voluminous amount case law cited. *See* 428 F. App'x at 620 (stating that "in this case we have much more than mere presence in an area known by the officers to be prone to drug trafficking).

In its decision, the Sixth Circuit focused on four factors in deciding to uphold the *Terry*

stop and frisk in *Johnson*:

> First, the officers were directed to a particular address based upon information from a confidential informant. Second, shortly after their arrival, the officers saw defendant approaching that address and called out to speak with him. Rather than stop, which he had no legal obligation to do, defendant entered the building for fewer than five seconds before re-emerging. Third, even though defendant agreed when asked to produce identification, he "fumbled" when doing so and the officers observed that he appeared to shield one side of his body. And, fourth, Officer Morton noticed that defendant's coat was sagging, which he believed might indicate a weapon.

*Id.* at 620–21.

The court went on to explain that the "critical factor" for determining whether there was reasonable suspicion for the *Terry* stop of Johnson was his "hurried entrance into the very building that the officers planned to target followed by a remarkably quick exit." *Id.* at 621. The court also explained that the since "due weight" had to be given to the officers' factual inferences, it was logical to conclude police "reasonably thought that [Johnson]'s five-second visit was an attempt to warn drug traffickers of the police presence." *Id.* (quoting *Luqman*, 522 F.3d at 616). "At the very least, [the defendant's expedient entrance and exit was] enough to justify the initial *Terry* stop." *Johnson*, 428 F. App'x at 621.

Just as a CI in *Johnson* made police aware of alleged illegal activity, so too did the CI in the instant case. The officers in *Johnson* had even less particularized knowledge about who was

conducting the criminal activity than Detectives Scott and Burnett did when they encountered Jason Turner. *See id.* at 617–18. Prior to the police's encounter with Johnson, the extent of their knowledge was that a CI had alleged drug trafficking and prostitution were occurring in a specific apartment unit. *Id.* Despite their limited knowledge, the Sixth Circuit found that the mere fact that an unidentified male ran into and out of the suspect apartment after hearing police call out to him was enough for a valid *Terry* stop to be carried out. *Id.* at 621. Here, the detectives had far more information than mere allegations of illegal activity and an address from the CI. The police in the instant case were also told the full name of the suspect allegedly trafficking drugs, the type of car he used, the fact he carried a firearm on him ninety percent of the time, and the specific types of narcotics being dealt: cocaine. Therefore, if the police in *Johnson* had valid reasonable suspicion from such a limited cache of information, so too must the detectives who accosted Jason Turner.

Unlike the officers in *Johnson*, the police in the instant case collected supplemental information on the defendant before stopping him. Here, detectives researched the defendant's criminal history and found he was a felon with convictions for cocaine trafficking. Police even went as far as to conduct covert surveillance on the rooms the defendant was staying in at the Regal Inn before approaching him. In the course of their surveillance, police confirmed the description of the car and girlfriend given to them by the CI, saw multiple people coming and going from his rooms, and observed what appeared to be hand to hand transactions. The detectives realized that the foot traffic and apparent transactions were consistent with narcotics sales. Hence, police in the instant case took even more steps in developing the defendant as a suspect before stopping him, unlike the officers in *Johnson*.

Based on the totality of the circumstances, including the CI's information, the defendant's criminal history, and observations from the surveillance, Detective Scott had reasonable suspicion

8

to conduct a brief investigatory stop on February 24, 2020. *See Luqman*, 522 F.3d at 617 (ruling that in determining if there is reasonable suspicion "the question is whether, when looking at the facts in total, the officers had reason to believe that criminal activity was afoot"). The CI specifically told the police that Jason Turner was dealing narcotics. *See Johnson*, 428 F. App'x at 620–21 (considering a CI's drug trafficking allegations at a specific apartment in determining reasonable suspicion). Police new the defendant had a history of felony convictions for cocaine possession. *See United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012) (factoring in the police's knowledge of a defendant's prior felony drug convictions in a reasonable suspicion analysis).

Furthermore, the motel and the area around it were known to detectives as a places of high drug trafficking. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."). The defendant was stopped while returning to the motel room where police had seen activity consistent with drug trafficking over the course of several weeks, including earlier that day. Hence, it was reasonable for Detective Scott to believe the defendant was returning to the Regal Inn to reengage in drug trafficking. *See Luqman*, 522 F.3d at 617 (holding that a court need not adopt a defendant's "innocent explanations" for his actions in determining reasonable suspicion). All these factors taken together unequivocally gave Detective Scott a "reasonable, articulable suspicion that the [defendant had] been, [was] or [was] about to be engaged in criminal activity." *Johnson*, 620 F.3d at 690 (quoting *Place*, 462 U.S. at 702). As such, the stop of the defendant was constitutional, and any evidence obtained by law enforcement as a result of it should not be suppressed.

>  B) **The Search Of The Defendant Was Constitutional Because Police Had Reasonable Suspicion The Defendant Was Armed And Dangerous, And Officers Limited The Scope Of The Search.**

Due to reliable information concerning the defendant being an armed cocaine dealer in tandem with his police interactions on February 24, 2020, Detective Scott had reasonable suspicion to search the defendant's person. Just as for initial stops, the standard for whether an officer may conduct a brief search of a person is reasonable suspicion that "criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30. However, such a search must be limited in scope to finding firearms or other weapons. *Id.* at 29–30. Because this test involves a reasonable suspicion standard, its result is also based on the totality of the circumstances. *See Arvizu*, 534 U.S. at 273; *Johnson*, 428 F. App'x at 620–21.

As previously stated, the Sixth Circuit in *Johnson* considered four factors in its totality of the circumstances analysis for the stop and frisk. *See Johnson*, 428 F. App'x at 620–21. The first two factors, use of a reliable CI and Johnson running into and out the suspect apartment, went toward a reasonable suspicion basis to stop the defendant. *Id.* In addition, the court also considered the defendant fumbling in his pockets while trying to shield one side of his body as well as the sagging of his jacket in establishing police had reasonable suspicion to conduct a protective frisk. *Id.*

In Jason Turner's case, police had even more reason to believe the defendant was armed and dangerous than the officers in *Johnson*. In *Johnson*, the police necessarily required the defendant put his hands in his pockets when they asked for him to produce identification. *See id.* at 618 Nonetheless, the Sixth Circuit still found that the defendant fumbling through his pockets weighed in favor of the officer's reasonable suspicion. *Id* at 620-21. In the instant case, police did not give the defendant a legitimate or necessary reason to reach in his pocket. Rather, Detective Scott

merely told him he was being investigated regarding allegations of drugs. Only after hearing police were suspicious of him did the defendant place his right hand in his jacket pocket. In addition, Detective Scott had reliable information the defendant carried a gun ninety percent of the time. Hence, Turner reaching into his pocket was even more suspicious than when the defendant in *Johnson* did so.

Furthermore, Detective Scott properly limited the scope of his search when he only grabbed the defendant's hand through the outside of the jacket to prevent what he reasonably believed was a weapon from being pulled out. Scott did not touch the defendant until he was in fear for his and Burnett's safety, and even then, he did not reach into the defendant's pocket. *See Sibron v. New York*, 392 U.S. 40, 65 (1968) (holding that reaching into a suspect's pocket without first making "an initial limited exploration for arms" exceeded the permissible scope of a protective frisk). In this case, Scott's "factual inferences" from his "specialized training" were correct in leading him to conclude the defendant was reaching for a firearm. *Luqman*, 522 F.3d at 616.

Finally, after grabbing the defendant's hand through the outside of the jacket, Scott immediately felt what he knew to be a handgun. The moment Scott knew a handgun was present, he had actual probable cause to make an arrest and secure the weapon because he was aware the defendant was a felon. By merely possessing a firearm while having a felony conviction, the defendant was committing both a State and Federal crime. *See* T.C.A. § 39-17-1307(b)(1)(B); 18 U.S.C. § 922(g)(1). Hence, the subsequent arrest of the defendant was wholly justified.

Because the search was constitutional, the firearm should not be suppressed. Under the totality of the circumstances, police had reasonable suspicion to frisk the defendant for weapons. The police knew the defendant was armed ninety percent of the time and the defendant only put his hand into the jacket pocket after being told he was under investigation for narcotics. These factors

indicate the police had reasonable suspicion the defendant was armed and dangerous. Furthermore, the subsequent search was constitutional and properly limited in scope since police did not reach into the defendant's pocket until they felt the outline of a pistol. Therefore, the defendant's motion to suppress the handgun as the fruit of an illegal search should be denied.

## **CONCLUSION**

For the aforementioned reasons, the United States respectfully submits that the Defendant's Motion to Suppress should be denied.

Respectfully submitted,

JOSEPH C. MURPHY
United States Attorney

/s/ *Nathan A. Vrazel*
NATHAN A. VRAZEL
Special Assistant U.S. Attorney
167 N. Main, Suite 800
Memphis, Tennessee 38103
Telephone: (901) 544-4231

CERTIFICATE OF SERVICE

I, Nathan A. Vrazel, Special Assistant United States Attorney for the Western District of Tennessee, hereby certify that a copy of the foregoing pleading was forwarded by electronic means via the Court's electronic filing system.

This date: February 3, 2022.

s/ *Nathan A. Vrazel*
NATHAN A. VRAZEL
Special Assistant United States Attorney
167 N. Main, Suite 800
Memphis, Tennessee 38103
Telephone: (901) 544-423